```
                UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
                      TAMPA DIVISION
```

TRAVIS HOUSTON,

    Plaintiff,

v.                        Case No. 8:22-cv-2878-VMC-TGW

R.T.G. FURNITURE CORP.
and SE INDEPENDENT DELIVERY
SERVICES, INC.,

    Defendants.

_____/

**<u>ORDER</u>**

      This matter comes before the Court pursuant to Defendant R.T.G. Furniture Corp.'s Motion for Summary Judgment (Doc. # 50) and SE Independent Delivery Services, Inc.'s Motion for Summary Judgment (Doc. # 51), both filed on October 16, 2023, seeking summary judgment on all claims in this Florida Civil Rights Act (FCRA) and 42 U.S.C. § 1981 case. Plaintiff Travis Houston responded on November 20, 2023. (Doc. # 58). Defendants replied on December 4, 2023. (Doc. ## 59, 60). For the reasons that follow, the Motions are granted.

**I.    <u>Background</u>**

    **A.    <u>RTG and SEIDS</u>**

      R.T.G. Furniture Corp. ("RTG"), which has a distribution center located in Lakeland, Florida, is an American furniture

store chain. (McBride Decl. at ¶ 3). RTG utilizes delivery companies at its Lakeland distribution center for its furniture deliveries. One such company is SE Independent Delivery Services, Inc. ("SEIDS"). (Id.; Crossley Decl. at ¶ 3). Both RTG and SEIDS operate out of the Lakeland distribution center.

As Houston acknowledged during his deposition, SEIDS and RTG are two separate companies. (Houston Depo. at 69:9-25). Indeed, SEIDS and RTG have different reporting structures and different management. (Id. at 131:13-22; McBride Decl. at ¶ 4). In addition, RTG and SEIDS do not and cannot (1) hire, fire, discipline, or direct the work of, (2) pay wages, taxes, or insurance for, and (3) control any terms and conditions for each other's employees. (McBride Decl. at ¶ 4; Crossley Decl. at ¶ 4). RTG and SEIDS also maintain their own personnel policies and procedures. (McBride Decl. at ¶ 4; Crossley Decl. at ¶ 4). "RTG had no control over the terms and conditions of [Houston's] employment with SEIDS, and SEIDS had no control over the terms and conditions of [Houston's] employment with RTG." (McBride Decl. at ¶ 4). That said, both SEIDS and RTG utilize Retail Management Services Corporation ("RMSC") for managerial and administrative services. (Id. at ¶¶ 1, 2).

The employee handbooks for RTG and SEIDS are very similar in form and content. (Doc. # 58-2; Doc. # 58-3).

"Between 2018 and 2019, the SEIDS loadout department, which was responsible for loading trucks of ordered RTG furniture for delivery by independent contractor drivers, was transitioned from SEIDS to RTG." (McBride Decl. at ¶ 5). The transition of this loadout function from SEIDS to RTG was "nationwide," which resulted in "the vast majority of SEIDS employees performing the loadout function" having their jobs eliminated. (Crossley Decl. at ¶ 5; McBride Decl. at ¶ 5). To preserve employment for many of the individuals impacted, RTG extended offers of employment to these individuals. (McBride Decl. at ¶ 5). These individuals were free to evaluate the job offers made to them by RTG and accept or decline as they wished. (Id.).

A small number of employees in loadout, including Tony Williams (African American), were transitioned into other positions within SEIDS. (Crossley Decl. at ¶ 6). By the time the transition was complete, there were few, if any, employees left in the loadout department of SEIDS. (Houston Depo. at 100:3-16).

Houston, who identifies as Black and African American, was employed by SEIDS from 1993 until December 29, 2019. (Id.

at 89:8-19, 123:10-19). During the transition of the loadout department from SEIDS to RTG, Houston was the loadout manager for SEIDS. (Doc. # 50-3). As Houston was part of the loadout department, his position was eliminated at SEIDS on or about December 29, 2019. (Id.).

Prior to his transition to RTG, Houston reached out to LaShay Crosby (Black, African American), Human Resources ("HR") Manager for the Lakeland distribution center and an employee of RMSC. (McBride Decl. at ¶¶ 1, 6). Houston asked her why he was offered a position at RTG. (Id. at ¶ 6). Ms. Crosby explained to Houston that the loadout department at SEIDS was being absorbed by RTG. While Houston did not have to accept any position with RTG, there were currently no open positions at SEIDS so Houston would have to continue monitoring the internal job bulletin boards for openings at SEIDS. (Id.). At no point during this conversation did Houston mention he was being discriminated or retaliated against, or harassed, based on any protected characteristic. (Id.).

Also at some point prior to his transition to RTG, a SEIDS employee, Gerry Brennan, told Houston that Houston needed to go have a meeting with Joe Tipping, SEIDS's Vice President of Operations. (Houston Depo. at 66:9-12; Tipping Depo. at 14:10-14). Houston testified that, when he asked

4

Brennan why Tipping wanted to meet, Brennan said "I don't know.  May — may — maybe they want to get rid of the few Black people that's left over here." (Houston Depo. at 66:12-19). Houston "brushed [the comment] off" as a "sarcastic joke." (Id. at 66:17-19). Still, during the meeting with Tipping, Houston told Tipping about Brennan's comment. (Id. at 66:19-23). Tipping responded "don't even worry about that; you know how [Brennan] is always making sarcastic jokes." (Id. at 66:23-25). The purpose of the meeting was for Tipping to inform Houston that Houston was going to be offered a position with RTG. (Id. at 67:1-8).

### B.   Plaintiff Moves to RTG

Houston was offered the position of RTG's loadout manager on the mid-shift, which was 11:00 a.m. to 7:00 p.m. (McBride Decl. at ¶ 7). This offer of employment was extended to Houston by David Bennett (Caucasian), a Vice President for RMSC. (Id.; Houston Depo. at 122:6-123:2). At the beginning of the meeting in which Bennett extended the job offer to Houston, Bennett said "well, that's my boy" as Houston walked in. (Houston Depo. at 115:20-24).

Houston accepted RTG's job offer and began his employment with RTG as a loadout manager on December 30, 2019. (Id. at 122:25-123:9; McBride Decl. at ¶ 7). When asked during

his deposition if Houston believed he was "employed by both [RTG and SEIDS] together," Houston replied "No." (Houston Depo. at 89:23-90:5). Rather, he agreed that he worked for SEIDS and then RTG afterwards. (Id.). Although he chose to accept the new position offered by RTG, Houston considered the job with RTG to be a "demotion" because he was moving from a general manager ("GM") to a "level five" manager position without an annual GM bonus and he would be working different hours. (Id. at 116:19-117:11).

In his role as a RTG loadout manager, Houston was responsible for managing a team that places RTG's furniture on trucks to get delivered to customers. (McBride Decl. at ¶ 8). Part of that responsibility was ensuring that the furniture is secured and protected so it arrives to customers in a satisfactory condition. (Id.). Also, the "Loadout Manager Expectations" specifically indicated that because Houston was managing the shipping bays and loading process, he was required to lead his team, which could include being physically present with them. (Id.). Overall, in this role, Houston was expected to demonstrate leadership, good judgment, accountability, professionalism, and effective communication. (Id.). Houston reported to Sharick Babb (Black, African American), the shift manager, and Babb

reported to Chris Hathcock (Caucasian), the operations manager. (Id. at ¶ 9).

On February 1, 2020, Houston received a pay raise and, at that time, he earned a higher salary at RTG than he did at SEIDS. (Houston Depo. at 135:11-13; McBride Decl. at ¶ 10). Although Houston was not eligible to receive an annual bonus at RTG (like he was eligible to earn at SEIDS), he was eligible to receive tri-annual bonuses. (Houston Depo. at 132:5-12, 135:16-19, 136:9-15; McBride Decl. at ¶ 10).

In 2020, RTG maintained the following shifts: the day shift (from 6:30 a.m. to 3:00 p.m.), the mid shift (from 11:00 a.m. to 7:00 p.m.), the second shift (from 4:30 p.m. to 1:00 a.m.), the night shift (from 5:30 p.m. to 4:00 a.m.), and the weekend shift. The mid shift overlaps with the day, second, and night shifts. (McBride Decl. at ¶ 11).

In 2020, the loadout managers at RTG were: Houston, Khayree Simpson (Black, African American), Peter Noel (Black, Grenadian), and Calvin Peterson (Black, African American). (Id. at ¶ 12). All loadout managers were required to work alternating Saturdays, on a rotating schedule. (Id.).

At some point in early 2020, Houston again reached out to Crosby in HR to address his concern that he believed the day shift had more staffing resources than the mid shift did,

and also that he felt the way RTG employees were loading the delivery trucks was inefficient. (Id. at ¶ 13). In response, Crosby coached him on how he could address these concerns with his team. (Id.). At no point during this conversation did Houston mention he was being discriminated or retaliated against, or harassed, based on any protected characteristic. (Id.).

At some point during his employment with RTG, Brian Beckham, RTG's second shift operations manager, told Houston and other RTG employees that Beckham "was trying to change the culture of the operation." (Houston Depo. at 183:10-18, 299:7-10). Houston testified that another RTG employee named Matt later told Houston about a conversation Beckham and Matt had. Beckham told Matt that Beckham was "trying to put more white people in those manager positions than Black." (Id. at 184:8-17).

### C.  **August 2020 Offensive Comment**

On August 11, 2020, Williams, who was now a returns manager for SEIDS, asked his supervisor, Angela Cook, to take an early lunch for his birthday. (Williams Depo. at 129:9-14, 133:8-13). Cook agreed and allegedly stated "don't come back on 'BPT' or 'Black People Time,'" and then proceeded to laugh. (Id. at 129:15-19). According to Williams, no one else

was a part of this conversation except Williams and Cook. (Id. at 129:20-23).

Williams testified that he went to Aubrey Henry, transportation manager for SEIDS, and told him what Cook said to him. (Id. at 131:25-132:11). Henry directed Williams to go to HR and make a report. (Id. at 132:11-16). Williams never went to HR. (Id. at 132:17-24). He also testified that he told Houston about the "BPT" or "Black People Time" comment. (Id. at 130:17-18).

Houston has a different recollection of this comment. Houston testified that Williams told him about the "Black People Time" comment, but Houston said that Williams reported to him that Cook said to Williams and "a couple guys in the breakroom," "what do you think you are on, you think you are on Black people time or what, what do you guys think you are doing." (Houston Depo. at 185:20-186:3, 328:6-14). Houston never heard Cook say this comment. (Id. at 186:20-21).

Although RTG policy would require Houston, as a manager, to report this comment to HR himself or direct the employee to do so, Houston did not report this comment to HR. (McBride Decl. at ¶ 14). Instead, he testified that he told RTG's operations manager Hathcock about it. (Houston Depo. at 186:3-6). According to Susan McBride, the head of HR for RMSC,

RTG never received any complaint regarding the "Black People Time" comment. (McBride Decl. at ¶¶ 1, 14). If RTG had received such a report, RTG would have had the individual making the report complete an internal complaint form, and then investigated the allegations. (Id. at ¶ 14).

### D.   The Flower Game

Scams with various names like the "Mandala Game," "Blessing Circle," "Infinity Loom," and "Giving Circle" are recognized by the Federal Trade Commission ("FTC") as "chain letter-type pyramid scheme[s]." Seena Gressin, *This "Game" Is A Chain Letter Scam*, Fed. Trade Comm'n Consumer Advice (May 21, 2020), https://consumer.ftc.gov/consumer-alerts/2020/05/game-chain-letter-scam (last visited December 12, 2023).

According to the FTC's May 2020 consumer warning, these scams work as follows: an individual receives an invitation to join a circle and they join by making a cash contribution to the person who invited them, called a "gift." Id. The individual is usually recruited to make the initial "gift" by being promised large returns on investment. Upon making the payment, the individual gets placed on the board. The individual moves towards the center of the board by recruiting others to join. Once the individual reaches the center, they

10

begin to collect the money from the new recruits to the board. As is typical with pyramid schemes, such "games" are dependent on recruiting new people in order to keep money flowing into the game. Once a board runs out of new recruits, the money dries up, and everyone waiting to reach the center of the board and receive payment, "comes up empty handed." See Id. ("What's the harm? Like other types of pyramid schemes, these chain letters depend on recruiting new people to keep money flowing into the enterprise. There are no products sold or real investments creating profits. Once players run out of new recruits to bring into the game, the money dries up and everyone waiting to reach the center comes up empty handed.").

After the FTC's May 2020 consumer warning, the FTC published another consumer warning in August 2020. Karen Hobbs, *A real or fake savings club?*, Fed. Trade Comm'n Consumer Advice (Aug. 10, 2020), https://consumer.ftc.gov/consumer-alerts/2020/08/real-or-fakesavings-club (last visited December 13, 2023). This article explains that "scammers are imitating a type of informal savings club known as a 'sou sou' or 'susu' to trick people into joining what amounts to an illegal pyramid scheme." Id. A "sou sou" is "a rotating savings club with historic roots in West Africa and the Caribbean. It's a

11

savings arrangement between a small group of trusted people – usually family and friends – who regularly pay a fixed amount into a common fund and take turns getting paid out." Id. Importantly, "[i]n a sou sou, you don't earn interest, never get out more than you paid in, and there's no reward for recruiting people to join." Id. The FTC cautions that "scammers are pitching fake sou sou savings clubs and opportunities like 'The Circle Game,' 'Blessing Loom,' [and] 'Money Board.'" Id. "These kinds of illegal pyramid schemes are the exact opposite of a sou sou: They promise you'll make more money than you put in and depend on recruiting new people to keep money flowing into the fund." Id.

On August 25, 2020, HR received a complaint from Patrick Jackson, lifts/bedding supervisor at RTG (Black, African American), that he was invited to join two "flower game" boards — one where he was invited by and paid Williams, a SEIDS employee, $500 to join, and another where he was invited by, and paid, Houston $1,500 to join. (McBride Decl. at ¶ 15). Jackson also stated that he was told by Williams and Houston that in return for his "investments," he would receive a return of $12,000 in 4-6 weeks. Jackson further stated that, after a while, he noticed that several individuals were joining these boards, but he was not moving towards the center

12

of the board, as promised. (Id.). At that point, Jackson asked for his money back, and Williams told him to "trust the process." Eventually, Jackson went to HR and filed his complaint against Williams and Houston. (Id.).

In response to Jackson's complaint, on August 27, 2020, VP of corporate security for RMSC, Jahnu Rodriguez, began his investigation into these allegations wherein he interviewed approximately 25-30 witnesses at the Lakeland distribution center between September 1 and 9, 2020. (Id. at ¶ 16 & Ex. B).

"As a result of [] Rodriguez's investigation, it was discovered that the flower game had been ongoing at the Lakeland distribution center since March 2020, and at least 25-30 individuals (but likely many more) were approached for 'gifts' ranging from $500 to $3,000." (McBride Decl. at ¶ 17). None of these individuals ever received a payout from their respective investments, despite being promised lucrative returns in 4-6 weeks. (Id.). Although the investigation discovered that numerous individuals participated in the flower game while at the workplace, only three individuals were identified as those soliciting the gifts — Williams, Houston, and Anthony Snead, another SEIDS employee. (Id.).

When Williams was interviewed about the flower game, he admitted he was involved and solicited funds, but did not think he was doing anything wrong because they were "gifts." (McBride Decl. at ¶ 18 & Ex. B at 2-3). Williams also provided a written statement wherein he memorialized his involvement with the flower game. (Id. at ¶ 18 & Ex. B at 4). During his deposition, Williams agreed that to move up the board to get into position at the top to be "gifted," a person needed to recruit other people to join the "flower game." (Williams Depo. at 137:3-25).

When Houston was interviewed about the flower game, he denied any involvement or knowledge of it. However, Jackson provided screenshots of messages about the flower game, which depicted Houston inviting Jackson and requesting $1,500. (McBride Decl. at ¶ 19 & Ex. B at 3, 7, 11). At his deposition, Houston admitted he participated in the flower game and received money from it. (Houston Depo. at 238:1-3, 239:4-8, 240:5-14, 241:3-18). He also acknowledged that Jackson was his subordinate employee. (Id. at 239:9-19). Houston did not claim during his deposition that the "flower game" was actually a "sou sou" or an investment or savings club. Rather, he thought of the "flower game" as "like a gamble. Like you

go in the casino and you put money in the slot machine." (Id. at 237:15-20).

Finally, when Snead was interviewed about the flower game, he admitted he was involved, but denied soliciting any funds. (McBride Decl. at ¶ 20 & Ex. B at 3). However, the investigation uncovered that Snead sent a video about the flower game to an associate on May 21, 2020, in an effort to get the associate to contribute funds. (Id.).

According to McBride, while RTG received a complaint about the "flower game," RTG "never received any complaints from any individual regarding 'lottery pools' or 'sports betting pools' at the Lakeland distribution center, such as being misled to participate by being promised lucrative returns on investment." (Id. at ¶ 23). "If RTG had received such a report, RTG would have investigated, and taken appropriate action if the investigation substantiated the allegations." (Id.).

### E.   **Houston's Termination**

Following Rodriguez's September 2020 investigation into the flower game, RTG shared its findings with SEIDS management, as Williams and Snead were SEIDS employees. (McBride Decl. at ¶ 21). As a result of their solicitations for a pyramid scheme, on September 10, 2020, all three

15

individuals were terminated for "gross misconduct" from their respective employment: Houston from RTG and Williams and Snead from SEIDS. (Id.). The decision to end Houston's employment was a group decision made by HR and management. (Id.).

According to McBride, the head of HR for RMSC, "[a]t no point during his employment did [Houston] complain to RTG that he was being discriminated or retaliated against, or harassed, based on any protected characteristic. If he had, RTG would have had [Houston] complete an internal complaint form, which he never did, and conducted an investigation." (Id. at ¶ 22).

Houston does not appear to dispute that he did not report any discrimination, harassment, or retaliation to RTG's HR. Rather, he points out that he did communicate with HR — through emails to Crosby — that he was dissatisfied with being transferred from SEIDS to RTG. (Houston Depo. at 119:4-120:4; McBride Decl. at ¶ 6). Houston also testified that he reported two offensive comments to higher-ups: (1) before his transfer from SEIDS to RTG, Houston told Tipping about Brennan's comment that "maybe they want to get rid of the few Black people that's left over here" (Houston Depo. at 66:17-25; 160:8-17); and (2) Houston complained about Cook's "Black

16

People Time" comment (that was made to Williams) to RTG's warehouse manager Hathcock. (Id. at 185:20-186:19).

### F.   **Procedural History**

Houston initiated this action in state court on October 31, 2022, asserting claims for race, color, and national origin discrimination under the FCRA and Section 1981 (Counts I, II, III, VI, VII, VIII), hostile work environment under the FCRA and Section 1981 (Counts V, X), and retaliation under the FCRA and Section 1981 (Counts IV, IX). (Doc. # 1-1). RTG and SEIDS removed the case to this Court on December 19, 2022. They filed their answers (Doc. ## 9, 12), and the case proceeded through discovery.

Now, RTG and SEIDS both seek summary judgment on all claims. (Doc. ## 50, 51). Houston has responded (Doc. # 58), and RTG and SEIDS have replied. (Doc. ## 59, 60). The Motions are ripe for review.

## II.   **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude

17

a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

In his complaint, Houston asserts claims for race, color, and national origin discrimination under the FCRA and Section 1981 (Counts I, II, III, VI, VII, VIII), hostile work environment under the FCRA and Section 1981 (Counts V, X), and retaliation under the FCRA and Section 1981 (Counts IV, IX) against both SEIDS and RTG.

**A.   No Joint Employment**

As a preliminary matter, there is no genuine dispute of material fact as to whether RTG and SEIDS are joint employers. They were not.

"[W]here two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as 'joint employers' and aggregate them." Lyes v. City of Riviera Beach, 166 F.3d 1332, 1341 (11th Cir. 1999). "Courts predominantly apply the standards promulgated by the National Labor Relations Board when deciding whether two entities should be treated as a joint employer." Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1359 n.6 (11th Cir. 1994).

> The basis of the finding [of a joint employer situation] is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

Id. at 1360 (quoting N.L.R.B. v. Browning-Ferris Indus. of Pennsylvania, Inc., 691 F.2d 1117, 1123 (3d Cir. 1982)).

20

"Thus, the ultimate focus of the joint employer inquiry is the degree of control one company exercises over the employees of another company." Kingsley v. Tellworks Commc'ns, LLC, No. 1:15-CV-4419-TWT-JSA, 2017 WL 2624555, at *17 (N.D. Ga. May 24, 2017), report and recommendation adopted, No. 1:15-CV-4419-TWT, 2017 WL 2619226 (N.D. Ga. June 15, 2017). "Whether [one company] retained sufficient control is essentially a factual question." Virgo, 30 F.3d at 1360.

Here, Houston testified that SEIDS and RTG are separate companies and that his employment with SEIDS was separate from his later employment with RTG. (Houston Depo. at 69:9-25, 89:23-90:5). Thus, Houston understood himself as working for two separate entities at two separate times.

More importantly, the evidence shows that RTG and SEIDS do not and cannot (1) hire, fire, discipline, or direct the work of, (2) pay wages, taxes, or insurance for, and (3) control any terms and conditions for each other's employees. (McBride Decl. at ¶ 4; Crossley Decl. at ¶ 4). As McBride explained, "RTG had no control over the terms and conditions of [Houston's] employment with SEIDS, and SEIDS had no control over the terms and conditions of [Houston's] employment with RTG." (McBride Decl. at ¶ 4). In short, RTG did not exercise much control over the employees of SEIDS, and vice versa. See

21

Wigfall v. Saint Leo Univ., Inc., No. 8:10-cv-2232-SCB-TGW, 2012 WL 717868, at *6 (M.D. Fla. Mar. 6, 2012) ("Nothing in the record shows that Saint Leo exercised the necessary control over Sodexo's employees to be deemed a joint employer. Saint Leo did not control the hiring and firing of the food service workers, did not pay them, and did not direct, supervise, or discipline them."), aff'd sub nom. Wigfall v. St. Leo Univ., Inc., 517 F. App'x 910 (11th Cir. 2013); see also Peppers v. Cobb Cnty., 835 F.3d 1289, 1300 (11th Cir. 2016) (finding that the County and the District Attorney did not act as joint employers for plaintiff investigator with the District Attorney's Office where the County "essentially [] act[ed] as a paymaster — its role consisted solely and entirely of issuing paychecks, ensuring investigators received proper benefits, distributing annual pay raises when requested and approved by the District Attorney, and approving the District Attorney's budget").

The fact that both RTG and SEIDS employees worked on furniture delivery in the Lakeland distribution center does not controvert the sworn statements that RTG and SEIDS did not exercise control over each other's employees. Likewise, the use by both SEIDS and RTG of RMSC as a contracted provider of HR and other administrative services and the similarity of

the companies' handbooks do not create a genuine dispute of fact about whether RTG and SEIDS exercised control over each other's employees.

Because RTG and SEIDS are not joint employers, the actions of one cannot be held to be the actions of the other. Rather, when considering Houston's claims against each Defendant, the Court will only consider that Defendant's actions during Houston's employment with that Defendant. For example, the actions or comments of SEIDS employees after Houston had stopped working for SEIDS and began working for RTG cannot support Houston's claims against RTG.[1]

**B.   SEIDS's Motion**

The Court will analyze the FCRA and Section 1981 claims together. See Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1256-57 (11th Cir. 2012) (explaining that Title VII and

---

[1] Alternatively, even if SEIDS and RTG were joint employers such that the conduct or comments of SEIDS employees could be attributed to RTG and vice versa, all Houston's claims would still fail. No reasonable jury could conclude that Houston's change of employment from SEIDS to RTG or his termination from RTG was the result of discrimination or retaliation given the evidence that SEIDS was eliminating its loadout department in 2018-2019 and RTG and SEIDS determined in good faith that the "flower game" in which Houston, Williams, and Snead participated and solicited funds was a pyramid scheme. Likewise, even considering all the comments made by both SEIDS and RTG employees and other evidence, the complained-of behavior still was not objectively severe or pervasive such that no hostile work environment claim could survive.

Section 1981 discrimination claims have the same requirements of proof and use the same analytical framework); Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) (noting that Title VII and Section 1981 hostile work environment claims have the same elements and are subject to the same analytical framework); Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1134 (11th Cir. 2020) (noting that retaliation claims under Section 1981 are analyzed under the same framework as Title VII claims); Arnold v. Heartland Dental, LLC, 101 F. Supp. 3d 1220, 1224 (M.D. Fla. 2015) ("When considering claims brought under the FCRA, Florida courts look to decisions interpreting Title VII . . . for guidance."); Carter v. Health Mgmt. Assocs., 989 So. 2d 1258, 1262 (Fla. 2d DCA 2008) ("Florida courts follow federal case law when examining FCRA retaliation claims.").

Houston worked for SEIDS from 1993 until December 29, 2019, and thus the Court confines its analysis for this Motion to events that occurred during this time. As discussed below, Houston's claims against SEIDS fail.

### 1. Discrimination Claims

In his complaint, Houston asserts claims for race, color, and national origin discrimination under the FCRA and Section 1981 (Counts I, II, III, VI, VII, VIII). He contends

that he has both direct and circumstantial evidence for his claims.

### (a)   Direct Evidence

"Direct evidence of discrimination is evidence that reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee, and, if believed, proves the existence of a fact *without inference or presumption*." Ossmann v. Meredith Corp., 82 F.4th 1007, 1015 (11th Cir. 2023) (citation omitted). "This is a 'rigorous standard.'" Id. (citation omitted). "[C]ourts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic], to constitute direct evidence of discrimination." Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989). "To constitute direct evidence, a statement must '(1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus.'" Castro v. Sch. Bd. of Manatee Cnty., 903 F. Supp. 2d 1290, 1299 (M.D. Fla. 2012) (quoting Chambers v. Walt Disney World Co., 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001)).

Here, none of the four statements upon which Houston relies (Doc. # 58 at 9-10) are direct evidence of

discrimination. At this time, the Court will discuss the two statements made by SEIDS employees, even though only one of these statements was made while Houston was a SEIDS employee. The statement — "I don't know. . . . [M]aybe they want to get rid of the few Black people that's left over here" — was made by SEIDS employee Brennan while Houston was a SEIDS employee. (Houston Depo. at 66:12-19). But Brennan was not the decisionmaker for whether Houston's role with SEIDS would be eliminated in the transition of loadout duties to RTG. Rather, "[b]etween 2018 and 2019, the SEIDS loadout department . . . was transitioned from SEIDS to RTG." (McBride Decl. at ¶ 5). This transition of this loadout function from SEIDS to RTG was "nationwide," which resulted in "the vast majority of SEIDS employees performing the loadout function" having their jobs eliminated. (Crossley Decl. at ¶ 5).

Furthermore, Brennan's statement was equivocal, being prefaced with "I don't know" and using the word "maybe." This is not the sort of blatant statement that proves discrimination without requiring any inferences. See Fernandez v. Trees, Inc., 961 F.3d 1148, 1156 (11th Cir. 2020) ("If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." (citation omitted)).

26

The other statement by a SEIDS employee was made by Cook, a supervisor with SEIDS, in August 2020 — months after Houston's employment with SEIDS had already ended and while Houston was working for RTG. (Williams Depo. at 129:9-23; Houston Depo. at 185:20-186:3). "A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination." Williamson v. Adventist Health Sys./Sunbelt, Inc., 372 F. App'x 936, 940 (11th Cir. 2010). Even considering Cook's offensive statement about "Black People Time" to Williams, this statement is not direct evidence. Cook was not the decisionmaker for Houston's termination from either SEIDS or RTG. And, while offensive, this statement is not a blatant statement connected to Houston's termination from either SEIDS or RTG. Compare Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (stating that "[o]ne example of direct evidence would be a management memorandum saying, 'Fire Earley — he is too old'").

Thus, Houston has not established a prima facie case based on direct evidence.

### (b)  Circumstantial Evidence

In his response, Houston argues that he has established a convincing mosaic of discrimination and does not address

the framework established by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). (Doc. # 58 at 12-13). Thus, the Court need only address whether a convincing mosaic of discrimination exists.

"Aside from the <u>McDonnell Douglas</u> framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" <u>Jenkins v. Nell</u>, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011)). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." <u>Id.</u> (citation omitted). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." <u>Id.</u>

Houston has not shown a convincing mosaic of discrimination based on race, color, or national origin against SEIDS. Houston's employment with SEIDS ended because

the vast majority of loadout positions with SEIDS "nationwide" were eliminated. (Crossley Decl. at ¶ 5; McBride Decl. at ¶ 5). These positions were eliminated because RTG had decided to transition the loadout function for furniture delivery into RTG. (Crossley Decl. at ¶ 5; McBride Decl. at ¶ 5).

True, Houston testified that a SEIDS employee, Brennan, remarked sometime around December 2019 that "maybe they [SEIDS] want to get rid of the few Black people that's left over here." (Houston Depo. at 66:9-19, 70:2-14, 329:24-330:11). Houston also testified, however, that he had "brushed [the comment] off" as a "sarcastic joke" rather than an explanation of his job's elimination. (Id. at 66:17-19). Regardless, it is undisputed that the transition of loadout services to RTG had begun in 2018 and was finishing up in December 2019, when Houston's position with SEIDS was eliminated. (McBride Decl. at ¶ 5).

While Houston takes issue with the fact that he was not one of the few SEIDS loadout employees who was transitioned into another position with SEIDS and considered his new job at RTG a "demotion," his belief that he should have been transferred to another position within SEIDS does not establish pretext. "A legitimate nondiscriminatory reason

29

proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." Worley v. City of Lilburn, 408 F. App'x 248, 251 (11th Cir. 2011); see also Gogel, 967 F.3d at 1136 ("Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" (citation omitted)). Houston has not rebutted that most SEIDS loadout employees had their positions eliminated and this was the result of a transition of loadout work to RTG. (Crossley Decl. at ¶¶ 5-6). While Houston also takes issue with Cook (Caucasian) staying with SEIDS in the position of returns manager, her retention with SEIDS does not rebut SEIDS's reason for eliminating Houston's loadout position. Furthermore, one of the few loadout employees who was moved to a different position within SEIDS was Williams (African American), which undercuts any inference that SEIDS did not wish to retain any African American employees. (Id. at ¶ 6). Thus, Houston has not shown

that SEIDS's reason for eliminating his position was pretextual and that the real reason was discrimination.

"Under but-for causation statutes, like [Section] 1981, [courts] ask whether the discriminatory conduct had a 'determinative influence' on the injury." Ziyadat v. Diamondrock Hosp. Co., 3 F.4th 1291, 1297–98 (11th Cir. 2021). Here, there is no genuine dispute of material fact as to whether the elimination of Houston's position in the loadout department with SEIDS was motivated by his race, color, or national origin. Because Houston's employment with SEIDS ended in December 2019, any events Houston points to that occurred after he began working for RTG — such as the offensive "Black People Time" comment from August 2020 — are irrelevant to Houston's claims against SEIDS.

Summary judgment is granted to SEIDS on Counts I, II, III, VI, VII, and VIII.

### 2. Hostile Work Environment Claims

"To establish a hostile work environment claim under [] 42 U.S.C. § 1981, an employee (or former employee) must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [his or her] employment.'" Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009) (citation omitted). The Eleventh Circuit has repeatedly instructed that a plaintiff

wishing to establish a hostile work environment claim must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

"The fourth element requires a plaintiff to prove that the work environment is both subjectively and objectively hostile." Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1249 (11th Cir. 2014). "To evaluate whether a work environment is objectively hostile, [courts] consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. at 1250-51 (citation and internal quotation marks omitted). "'No single factor is required' to establish the objective component. Instead, the court is to judge the totality of the circumstances." Nelson v. Keep Smiling

Dental, P.A., No. 8:21-cv-189-VMC-JSS, 2022 WL 485244, at *7
(M.D. Fla. Feb. 17, 2022) (citation omitted).

In support of these claims, Houston cites the four
comments he relied upon to establish his discrimination
claims: (1) Brennan's comment "I don't know.  May — may —
maybe they want to get rid of the few Black people that's
left over here."; (2) Bennett's "well, that's my boy" comment;
(3) Cook's "Black People Time" comment to Williams, which
Williams relayed to Houston; and (4) Beckham's comment about
"changing the culture" of the warehouse to Houston and others
and, as relayed by another SEIDS employee, Beckham's alleged
comment that Beckham wanted to put more white managers in
place. (Doc. # 58 at 11).

Houston's hostile work environment claims against SEIDS
fail because the conduct alleged here is not objectively
severe or pervasive. As to SEIDS, only Brennan's comment was
made by a SEIDS employee during Houston's employment with
SEIDS. The Court only treats SEIDS as responsible for whether
this comment created a hostile work environment for Houston.
Brennan's comment is one stray remark in which no racial slurs
or humiliating language was used. This comment was not
physically threatening or humiliating. Nor did the remark
unreasonably interfere with Houston's job performance:

Houston "brushed [the comment] off" as a "sarcastic joke" and went to his meeting with Tipping, who he told about the comment. (Houston Depo. at 66:17-25); see also Nelson, 2022 WL 485244, at *7 ("[T]he fourth factor – interference with job performance – does not weigh in Nelson's favor as she testified that she tried to brush off these comments and get on with her work duties.").

Additionally, even if the Court considers Bennett's "well, that's my boy" comment, which was made during Houston's employment with SEIDS but in the context of RMSC Vice President Bennett's offering Houston a job with RTG, the aggregation of Brennan's and Bennett's comments still are not severe or pervasive. Here, Bennett's brief statement of "well, that's my boy" was made in the context of Houston entering a meeting during which Bennett offered Houston a job with RTG. (Houston Depo. at 115:6-24). While Houston was offended by this choice of words, given that the word "boy" historically has racial overtones, this one-time comment was not severe. The comment was not physically threatening. Nor did it unreasonably interfere with Houston's job performance: Houston ultimately accepted the job with RTG that was offered to him.

34

The conduct cited by Houston is far less significant than that held sufficient to survive summary judgment by other courts. See, e.g., Hedgeman v. Austal, U.S.A., L.L.C., 866 F. Supp. 2d 1351, 1364 (S.D. Ala. 2011) (holding that hostile work environment claim based on racial harassment survived summary judgment where Caucasian co-workers and supervisors referred to African Americans by racial slurs "on an almost daily basis during [plaintiff's] employment," plaintiff "regularly encountered racial graffiti" in the workplace bathrooms, and "images of the Confederate flag . . . permeated the workplace as regularly displayed and/or worn on Caucasian co-workers' t-shirts"); Nelson, 2022 WL 485244, at *6 (hostile work environment claim survived summary judgment where plaintiff's supervisor called plaintiff a "'stupid black bitch' on more than five occasions and 'possibly' on more than 10 occasions over a two-year period," "taunted [plaintiff] about being late, saying that was the 'colored people time that they talk about,'" and "made comments about [plaintiff's] eating habits, telling [plaintiff] 'You better stop eating that n----- food. You're going to get too fat'").

Thus, Houston's hostile work environment claims against SEIDS (Counts V and X) fail.

### 3.   Retaliation Claims

"A plaintiff [] establishes a *prima facie* case of retaliation under [Section] 1981 by demonstrating that: '(1) [he] engaged in statutorily protected activity; (2) [he] suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action.'" Johnson v. Fam. Prac. & Inj. Ctr., Inc., 437 F. Supp. 3d 1108, 1120 (M.D. Fla. 2020) (quoting Chapter 7 Trustee, 683 F.3d at 1259). As for the third element, "a plaintiff bringing a [Section 1981] retaliation claim 'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" Id. at 1121 (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)).

In his response's section on the retaliation claims, Houston relies on only one act of protected activity: his reporting Cook's "Black People Time" comment to Hathcock in August 2020. (Doc. # 58 at 19). He emphasizes that he was terminated from RTG one month later in September 2020. (Id.). Thus, Houston reasons, the close temporal proximity between his complaint about Cook's comment and his termination creates a genuine issue of material fact about the causal connection between the two events.

36

This argument fails as to SEIDS because in August 2020 Houston was not working at SEIDS. Indeed, his employment with SEIDS ended in December 2019 and Houston was an RTG employee in 2020. (Houston Depo. at 89:8-19, 123:10-19; Doc. # 50-3). Thus, SEIDS could not have retaliated against Houston for making a complaint to his RTG supervisor in August 2020.

Again, the only protected activity Houston raises in his response's section on retaliation is the August 2020 complaint to Hathcock about Cook. (Doc. # 58 at 19). Thus, although he mentions in his statement of material facts and other portions of his response that he told Tipping about Brennan's comment before his employment with SEIDS ended, Houston has not argued that his reporting Brennan's comment to Tipping was protected activity for the purposes of his retaliation claims. "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments." Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995); see also Fils v. City of Aventura, 647 F.3d 1272, 1284 (11th Cir. 2011) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the

parties."). Thus, the only protected activity the Court will consider is the August 2020 report about Cook's comment.[2]

Summary judgment is granted on Houston's retaliation claims against SEIDS (Counts IV and IX).

C.  **RTG's Motion**

Houston worked for RTG from December 30, 2019, until his termination on September 10, 2020. Thus, the below analysis relates only to Houston's employment with RTG during this time. As explained below, Houston's claims against RTG fail.

---

[2] Even if Houston had argued that his reporting Brennan's comment to Tipping was protected activity, his retaliation claims against SEIDS would still fail. No reasonable jury could find a causal connection between Houston's reporting Brennan's comment and the elimination of Houston's job with SEIDS. Notably, the nationwide transition of all loadout work from SEIDS to RTG had begun in 2018 and continued through 2019. (McBride Decl. at ¶ 5; Crossley Decl. at ¶ 5). Thus, essentially all loadout jobs were being eliminated from SEIDS, with only a few SEIDS employees being transitioned to other positions. (Crossley Decl. at ¶ 6; McBride Decl. at ¶ 5). This transition was the reason for Houston's job being eliminated — not his reporting Brennan's comment to Tipping at the end of 2019. Indeed, Brennan made his comment in the context of telling Houston that Tipping had asked to meet with Houston. (Houston Depo. at 66:9-16). The purpose of the meeting with Tipping was for Tipping to tell Houston that Houston was being offered a position with RTG. (Id. at 67:1-8).

### 1.   Discrimination Claims

### (a)   Direct Evidence

Again, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic], [] constitute direct evidence of discrimination." Carter, 870 F.2d at 582.

Just as with SEIDS, there is no direct evidence of discrimination by RTG. The two statements made by SEIDS employees Brennan and Cook are not direct evidence of discrimination by RTG. Nor do the two other statements invoked by Houston constitute direct evidence.

As for Vice President for RMSC Bennett's saying "well, that's my boy" as Houston walked into the meeting during which Bennett offered Houston a job at RTG in approximately December 2019 (Houston Depo. at 115:20-24), this is not direct evidence that discriminatory animus motivated Houston's termination by RTG months later in September 2020. Even setting aside that Bennett is an employee of RMSC rather than RTG, Bennett's calling Houston "boy" is not a blatant statement connected to Houston's termination. See Williamson, 372 F. App'x at 940 ("A biased statement, separate in time from the employment decision under challenge, is not direct evidence of discrimination.").

The last statement upon which Houston relies is RTG's second shift operations manager Beckham's comment that he "was trying to change the culture" of the distribution center. (Houston Depo. at 183:10-18, 299:7-10). This is a race-neutral comment by itself. Even taking as true RTG employee Matt's alleged statement to Houston that Beckham told Matt that Beckham was "trying to put more white people in those manager positions than Black" (Id. at 184:8-17), this statement is not direct evidence of discrimination. First, it is unclear when during Houston's multi-month employment with RTG that Beckham supposedly made this comment to Matt. Also, there is no evidence that Beckham was involved in the decision to terminate Houston. Thus, this statement does not prove without any inference that Houston's termination was based on discrimination.

No direct evidence of discrimination exists here.

### (b)   Circumstantial Evidence

In his response, Houston argues that he has established a convincing mosaic of discrimination. (Doc. # 58 at 12-13). Again, "[a] plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred,

40

(2) 'systematically better treatment of similarly situated employees,' and (3) pretext." Jenkins, 26 F.4th at 1250.

Houston has not established a convincing mosaic of race, color, or national origin discrimination by RTG. The comments Houston points to that were made related to his employment with RTG are insufficient to enable a reasonable jury to find that Houston was terminated for discriminatory reasons. First, although the word "boy" often is evidence of discriminatory animus, it does not appear that Vice President of RMSC Bennett was expressing animus when he once referred to Houston as "boy" during the meeting about Houston's becoming a RTG employee. Notably, Bennett's brief statement of "well, that's my boy" was made in the context of Houston's entering a meeting during which Bennett offered Houston a job with RTG. (Houston Depo. at 115:6-24). Thus, this one-off comment made while hiring Houston does not suggest that RTG decided to fire Houston months later based on his race, color, or national origin.

Second, the comment about "Black People Time" is not evidence against RTG because that comment was made by Cook, an employee of SEIDS during Houston's employment at RTG. (Williams Depo. at 129:9-23; Houston Depo. at 185:20-186:3). A SEIDS employee's offensive statement does not suggest that

RTG possessed discriminatory animus. As for Beckham's statement that he wanted to "change the culture" of the warehouse, that statement makes no reference to race, color, or national origin. (Houston Depo. at 183:10-18). The comment that best supports the existence of discriminatory animus is RTG employee Matt's alleged statement to Houston that Beckham told Matt that Beckham was "trying to put more white people in those manager positions than Black." (Id. at 184:8-17). Even accepting this hearsay statement, there is no evidence that Beckham played a role in Houston's termination. Rather, the employee who complained to HR about Houston and the "flower game" was African American and the investigation into that complaint was not performed by Beckham. (McBride Decl. at ¶¶ 15-16).

Even if the Court thought these three comments lent some support for Houston's claims, Houston still could not establish a convincing mosaic of discrimination. Houston has not shown that the given reason for his termination — his participation in the "flower game" and soliciting money from co-workers for that pyramid scheme — was pretextual.

The Eleventh Circuit has "repeatedly emphasized that '[p]rovided . . . the proffered reason [for an adverse employment action] is one that might motivate a reasonable

employer, an employee must meet that reason head on and rebut it.'" Gogel, 967 F.3d at 1136 (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)); see also Worley, 408 F. App'x at 251 ("A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination."). "Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Gogel, 967 F.3d at 1136 (citation omitted). "[A] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1349 (11th Cir. 2007) (citation omitted). The Court cannot second guess the defendant's business judgment or inquire as to whether its decision was "prudent or fair." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 2003).

Here, Houston admits he participated in the "flower game" and received money from it. (Houston Depo. at 238:1-3, 239:4-8, 240:5-14, 241:3-18). He also acknowledged that Jackson was his subordinate employee. (Id. at 239:9-19). Houston's attempt in his response to cast the "flower game" as a legitimate "sou sou" savings club favored by Black and African American people is both disingenuous and unpersuasive. (Doc. # 58 at 14-16). The "flower game" engaged in by Houston was not a legitimate "sou sou" because many employees who "invested" never got their money back. (McBride Decl. at ¶¶ 15, 17 & Ex. B). This failure to return money "invested" was the reason Jackson complained about the "flower game" and Houston's involvement in it to HR. (Id. at ¶ 15). Rather, just like the fake sou sous that the FTC warned were pyramid schemes in August 2020, the "flower game" promised large returns on investment and failed to deliver. (Id. at ¶¶ 15, 17 & Ex. B); see also Karen Hobbs, *A real or fake savings club?*, Fed. Trade Comm'n Consumer Advice (Aug. 10, 2020), https://consumer.ftc.gov/consumer-alerts/2020/08/real-or-fakesavings-club (last visited December 13, 2023) ("These kinds of illegal pyramid schemes are the exact opposite of a sou sou: They promise you'll make more money than you put in and depend on recruiting new people

to keep money flowing into the fund."). Finally, Houston did not consider the "flower game" to be a "sou sou"; rather, he considered it another form of gambling. (Houston Depo. at 237:15-20).

Thus, Houston has not rebutted RTG's conclusion that Houston had solicited money from employees, including his subordinate Jackson, to participate in a pyramid scheme. While Houston notes that lottery or sports betting pools existed at the Lakeland distribution center (Doc. # 58 at 15-16), RTG "never received any complaints from any individual regarding 'lottery pools' or 'sports betting pools' at the Lakeland distribution center, such as being misled to participate by being promised lucrative returns on investment." (McBride Decl. at ¶ 23).

Even if the "flower game" had been a legitimate sou sou, Houston still cannot show pretext because there is no evidence that RTG did not believe in good faith that the "flower game" was a pyramid scheme. "The relevant inquiry is [] whether the employer in good faith believed that the employee had engaged in the conduct that led the employer to discipline the employee." Gogel, 967 F.3d at 1148. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside

of the decision maker's head." <u>Alvarez v. Royal Atl. Devs.,</u>
<u>Inc.</u>, 610 F.3d 1253, 1266 (11th Cir. 2010).

Again, RTG had an investigator — Rodriguez — investigate
Jackson's complaint about the "flower game." (McBride Decl.
at ¶¶ 17-21 & Ex. B). Rodriguez, after conducting multiple
interviews and reviewing evidence including screen shots of
messages from Houston, determined that the "flower game" was
a pyramid scheme. (<u>Id.</u>). All three employees of RTG or SEIDS
who were found to have solicited money for the "flower game"
— Houston, Williams, and Snead — were terminated based on
their participation. (<u>Id.</u> at ¶ 21). There is no reason to
doubt that RTG relied in good faith on Rodriguez's
investigation in deciding to terminate Houston.

Because there is no convincing mosaic of discrimination
here, the Court grants summary judgment to RTG on Houston's
discrimination claims (Counts I, II, III, VI, VII, and VIII).

### 2.   Hostile Work Environment Claims

As discussed before, "[t]o establish a hostile work
environment claim under [] 42 U.S.C. § 1981, an employee (or
former employee) must show harassing behavior 'sufficiently
severe or pervasive to alter the conditions of [his or her]
employment.'" <u>Bryant</u>, 575 F.3d at 1296 (citation omitted).
"To evaluate whether a work environment is objectively

hostile, [courts] consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Adams, 754 F.3d at 1250-51 (citation and internal quotation marks omitted).

In support of these claims, Houston cites the four comments he relied upon to establish his discrimination claims: (1) Brennan's comment "I don't know.  May — may — maybe they want to get rid of the few Black people that's left over here."; (2) Bennett's "well, that's my boy" comment; (3) Cook's "Black People Time" comment to Williams, which Williams relayed to Houston; and (4) Beckham's comment about "changing the culture" of the warehouse to Houston and others and, as relayed by another SEIDS employee, Beckham's alleged comment that Beckham wanted to put more white managers in place. (Doc. # 58 at 11).

As with SEIDS's Motion, the conduct about which Houston complains as to RTG is not objectively severe or pervasive. Both Brennan's and Bennett's comments were made before Houston began working at RTG, so cannot support a hostile work environment claim against RTG. Even considering the

Bennett comment, it was a stray offensive utterance that did not unreasonably interfere with Houston's job performance.

Next, Cook was a SEIDS employee who made the racist comment about "Black People Time" to another SEIDS employee, Williams. (Williams Depo. at 129:9-23). As Cook was not an RTG employee, there is no reason why her comment should be attributed to RTG. But, even if the comment was relevant to whether RTG created a hostile work environment, the comment was a one-time offensive remark that was not directed at Houston and that Houston did not personally hear. Rather, Williams simply relayed the comment to Houston. See Williams v. JPI Jones Pharm., No. 8:03-cv-2561-JSM-MAP, 2005 WL 1863402, at *2 (M.D. Fla. July 29, 2005) (granting summary judgment where racially discriminatory incidents occurred outside of plaintiff's presence and were simply relayed to her by other employees because such incidents are "less severe, threatening, and humiliating than any that involved Plaintiff personally or that she actually observed take place"). Thus, while offensive and unacceptable, this comment was less severe.

Finally, Beckham's comment directly to Houston and others that Beckham "wanted to change the culture" of the Lakeland distribution center was a one-time race-neutral

48

comment. This comment was not severe. The only racial comment
Beckham allegedly made was to another RTG employee named Matt.
Matt then relayed to Houston that Beckham said he was "trying
to put more white people in those manager positions than
Black." (Houston Depo. at 184:8-17). While certainly
offensive, this comment was not made directly to Houston. Nor
is this comment physically threatening or humiliating. There
is no evidence that this comment unreasonably interfered with
Houston's job performance.

Taken together and considered under the totality of the
circumstances, the comments and conduct about which Houston
complains that occurred over a 9 or 10-month span were not
severe or pervasive. Compare Jones v. UPS Ground Freight, 683
F.3d 1283, 1303-04 (11th Cir. 2012) ("Here, there were seven
incidents of racist acts over a year, four of which — the
last two banana incidents, the Confederate clothing and what
reasonably could be perceived as a threatening confrontation
— occurred within a two-week period of time near the end of
Mr. Jones's employment with UPSF. It is this escalation of
incidents, with a possibly threatening confrontation as its
centerpiece, that makes the issue of racial harassment, as
that term is used in the statute, one for the trier of

fact."). Summary judgment is granted on Houston's hostile work environment claims against RTG (Counts V and X).

### 3.  Retaliation Claims

Again, "[a] plaintiff [] establishes a *prima facie* case of retaliation under [Section] 1981 by demonstrating that: '(1) [he] engaged in statutorily protected activity; (2) [he] suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action.'" Johnson, 437 F. Supp. 3d at 1120 (citation omitted). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. But mere temporal proximity, without more, must be 'very close.'" Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (citations omitted).

As mentioned before, in his response's discussion of the retaliation claims, Houston relies on only one act of protected activity: his reporting Cook's "Black People Time" comment to Hathcock in August 2020. (Doc. # 58 at 19). He emphasizes that he was terminated from RTG one month later in September 2020. (Id.). According to Houston, the close temporal proximity between his complaint about Cook's comment

50

and his termination creates a genuine issue of material fact about the causal connection between the two events.

But "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 520-23 (11th Cir. 2007) (holding that plaintiff failed to show a genuine dispute as to causation or pretext for the allegedly retaliatory termination where plaintiff threatened violence against a co-worker — an "intervening act of misconduct" — five days after reporting suspected racial discrimination). "Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011). Even considering that Houston told Hathcock about Cook's "Black People Time" comment in August 2020, the HR investigation determining that Houston was involved in the "flower game" and had solicited money from Jackson breaks any causal link between Houston's protected activity and his termination. See Fleming v. Boeing Co., 120 F.3d 242, 248 (11th Cir. 1997) (holding that the plaintiff had failed to establish causation, even though the employer refused to hire her for a permanent position shortly after

she had filed a complaint of sexual harassment, because it was clear from the record that the plaintiff failed to meet the employer's qualifications for permanent employment — namely, she had failed to pass a required typing test).

In short, given RTG's discovery of Houston's misconduct in participating in the "flower game," no reasonable jury could conclude that Houston's complaint about the comment by Cook (a SEIDS rather than RTG employee) was the cause for his termination. Thus, summary judgment is granted to RTG on Houston's retaliation claims (Counts IV and IX).

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant R.T.G. Furniture Corp.'s Motion for Summary Judgment (Doc. # 50) is **GRANTED.**

(2) Defendant SE Independent Delivery Services, Inc.'s Motion for Summary Judgment (Doc. # 51) is **GRANTED.**

(2) The Clerk is directed to enter judgment in favor of Defendants R.T.G. Furniture Corp. and SE Independent Delivery Services, Inc. and against Plaintiff Travis Houston on all counts of the complaint.

(3) Thereafter, the Clerk is directed to terminate all pending deadlines and **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>3rd</u>

day of January, 2024.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE